IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TAMMY THOMAS-BROWN,

        Plaintiff,

    v.

NANCY A. BERRYHILL,[1]
Commissioner of Social Security,

        Defendant.

6:16-cv-01401-PK

OPINION AND ORDER

PAPAK, Magistrate Judge:

Plaintiff Tammy Thomas-Brown filed this action on July 11, 2016, seeking judicial review of the Commissioner of Social Security's final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The Court has considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] Nancy A. Berryhill replaced Carolyn W. Colvin as Acting Commissioner of Social Security on January 20, 2017, and is therefore substituted as the Defendant in this action pursuant to Fed. R. Civ. Pro. 25(d).

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 404.1520(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, an Administrative Law Judge ("ALJ") considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 404.1520(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-41; *see also* 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, Subpt. P, App. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 404.1520(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[2] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. § 404.1545(a); *see also* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

---

[2] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

PAGE 3 – OPINION AND ORDER

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. If the Commissioner meets its burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. A claimant will be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566.

## LEGAL STANDARD

A reviewing court must affirm an ALJ's decision if the ALJ applied proper legal standards and his findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.* (citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). The court may not substitute its judgment for that of the Commissioner. *See id.* (citing *Robbins*, 466 F.3d at 882); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation."

*Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citing *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).

## BACKGROUND

Thomas-Brown was born October 25, 1963. Tr. 179. She obtained a high school diploma in 1981. Tr. 196. Prior to her claimed disability onset date of April 8, 2012, Thomas-Brown had past relevant work experience as a waitress, busser, and cook. Tr. 29, 75, 179. After being terminated from her most recent job in February 2010, Thomas-Brown collected unemployment compensation until April 2012—the same month she alleges her disability began. Tr. 196.

In July 2009, Thomas-Brown presented to the Bay Area Hospital emergency department ("ED") after she fell while walking up the steps to her home. Tr. 261. Dr. Rohit Nanda noted that Thomas-Brown had an "obvious nasal fracture" and a "small contusion" on her forehead. *Id.* Dr. Nanda also observed that Thomas-Brown had a "slight slurring of her speech consistent with alcohol use" that day. Tr. 262. In connection with Thomas-Brown's visit to the ED, Dr. Nanda ordered numerous imaging studies taken. A CT-scan and x-rays taken of the cervical spine revealed no fractures, no "significant focal disc protrusion," and "mild degenerative disc disease narrowing at C5-6 and C6-7 with transverse endplate ridging and mild to moderate bony foraminal stenosis." Tr. 264; *accord* Tr. 270. The imaging studies also suggested a "possible nodular mass at the right lung apex," requiring further investigation. Tr. 270. A subsequent chest x-ray revealed "moderate chronic obstructive pulmonary disease" and "evidence of [a] prior right apical lung surgery"; however, "[n]o true lung nodule" was identified. Tr. 272. A head CT-scan showed "normal intracranial structures," and a "probable mildly depressed nasal fracture." Tr. 268. Thomas-Brown was treated with morphine for her pain, and discharged with instructions to follow up with a specialist for her nose if, after the swelling subsided, there was an unacceptable amount of deviation in her nose. Tr. 262. There is no evidence in the record

PAGE 5 – OPINION AND ORDER

indicating whether Thomas-Brown sought additional medical treatment relating to injuries resulting from her fall.

In October 2011, Thomas-Brown was seen by Dr. Dallas Carter. Tr. 273. She complained of hoarseness and throat irritation, a prolapsed rectum, left ear pain relating to her jaw, and asthma symptoms. *Id.* Dr. Carter observed that although Thomas-Brown's voice was hoarse, her throat was "unremarkable," and her lungs sounded clear without wheezing. *Id.* He found that her left eardrum was normal with some tenderness in her temporomandibular joint. *Id.* Dr. Carter also noted that her rectal prolapse was "more of a surgical problem" that would require "some special program" to address. *Id.* He gave Thomas-Brown samples of Celebrex for her jaw issues and hydrocodone for her pain. *Id.* Thomas-Brown reported that she was going to see an ear, nose, and throat ("ENT") doctor at a free clinic the following month. *Id.* Dr. Carter also requested that she return for a follow-up with him three to four weeks later. *Id.* The record reflects that Thomas-Brown never sought out an ENT specialist, and she cancelled her follow-up appointment with Dr. Carter. *Id.*

On October 22, 2012, Thomas-Brown protectively filed an application for DIB benefits, alleging a disability onset date of April 8, 2012. Tr. 179-80. In connection with her application, Thomas-Brown claimed to be disabled by degenerative arthritis, prolapsed bowel, irritable bowel syndrome ("IBS"), arthritis, fibromyalgia, depression, carpal tunnel syndrome ("CTS"), tendonitis, inflammation of rib cartilage, asthma, and allergies to propane and scents. Tr. 195. Thomas-Brown characterized the limitations caused by her impairments as follows:

> Due to the varicose veins, am no longer capable of walking or standing for more than a [half] hour or so at a time. Cannot lift anything without my bowel coming out, so pretty much stuck on my butt—but because of the fibro and arthritis [I] am not able to sit for any length of time either. Because of the IBS and spastic colon, the slightest stress causes me to lose my stool [without] any

warning. This makes it rough to be able to work in any industry with the public. I have become extremely depressed and have become slightly anti-social due to my prolapsed bowel . . . . The [CTS] makes it difficult to do tasks without losing the feeling in my hands and fingers. My asthma has gotten worse and if I am around any allergens such as propane, diesel, perfumes, mildew, dogs, cats, or birds, [I] am [i]ncapable of breathing and everyone thinks I have [tuberculosis]. This in turn inflames the rib cart[ilage] and causes severe pain.

Tr. 216.

Thomas-Brown described that her daily activities included doing at least one chore a day, such as dishes, laundry, taking out the garbage, or vacuuming; visiting with neighbors; reading a book, watching television, and using the computer; laying around a lot; and cooking for approximately a half-hour at least once a day. Tr. 217, 220. She reported grocery shopping "every couple of weeks" for no more than an hour each trip. Tr. 219. She claimed she cannot lift over five pounds, squat for longer than 20 seconds, walk more than a couple of blocks before needing rest, kneel, sit for more than an hour, nor climb more than ten steps. Tr. 221. Thomas-Brown further reported she has difficulty following written instructions, getting along with authority figures, handling stress, and tolerating changes in her routine. Tr. 221-22. Thomas-Brown's friend, Ms. Connie Miller, provided a third-party function report that was largely consistent with Thomas-Brown's self-report of her symptoms and activities of daily living. Tr. 224-31. The additional information provided by Ms. Miller was that Thomas-Brown dog-sits for her and another neighbor, drinks alcohol daily to fall sleep, smokes cannabis daily for pain, and is capable of performing yardwork. Tr. 225.

In February 2013, Thomas-Brown underwent a consultative psychiatric examination conducted by Dr. Charles Reagan. Tr. 274-79. She reported to Dr. Reagan that she had been depressed since the age of eight, and felt sad more days than not since. Tr. 274. Thomas-Brown also reported periodic episodes of increased energy accompanied by decreased sleep. Tr. 275.

PAGE 7 – OPINION AND ORDER

She described being on multiple anti-depressants in the past, which either did not work or caused her to become irritable with racing thoughts and decreased sleep. *Id.* She alleged that she was diagnosed with attention-deficit/hyperactivity disorder ("ADHD") in grade school. *Id.* She also described being a victim of abuse during her childhood and that she "remembers all that happened to her since the age of [one]." *Id.* She recounted that she experienced physical and sexual abuse throughout her life, with the most recent occurrence taking place three years prior. *Id.* Thomas-Brown further described avoiding people who talk about her, difficulty expressing her emotions, and feeling estranged from others. *Id.* She relayed difficulties with concentration, sleep, hypervigilance, controlling her anger, and startle response. *Id.* She also reported hearing angels when she "needs to have them talk to her," and the voices "tell her the truth and what to do." *Id.* Thomas-Brown described experiencing panic episodes twice a year, obsessively counting throughout the day, and avoiding social situations out of fear that she might do something embarrassing. Tr. 276. She further reported that since approximately the age of 12, she has been drinking two to three 24-ounce beers and smoking a gram of cannabis and ten cigarettes daily. *Id.*

Dr. Reagan noted that Thomas-Brown was morbidly obese, had tanned skin, disheveled hair, and was appropriately dressed. Tr. 277. Dr. Reagan observed Thomas-Brown biting her lips during the examination, but "no other tics or unusual mannerisms" were noted. *Id.* She appeared a "bit psychomotor retarded," had a congruent affect with a modestly sad and anxious mood, and her thought was linear. *Id.* On examination, Thomas-Brown recalled two out of three words correctly after a five-minute delay, spelled "world" correctly forwards and backwards, named four out of the last five presidents, and identified two cities on the eastern seaboard. *Id.*

She was capable of seven serial digits forward, six serial digits forward and backwards, and subtracting serial-sevens from 100 with only one mistake. *Id.*

Dr. Reagan opined that Thomas-Brown had post-traumatic stress disorder ("PTSD") from her abusive childhood. *Id.* However, due to Thomas-Brown's description of memories from the age of one, Dr. Reagan found there were "reliability issues" because "[p]eople do not have formed memories from this age." *Id.* Dr. Reagan further opined that Thomas-Brown had mild difficulty with concentration and modest difficulty with instructions. Tr. 278. He also noted that Thomas-Brown described symptoms of "dysthymia," but was unsure if she described "major depression." Tr. 277. Dr. Reagan diagnosed PTSD, ADHD "of the combined type," obsessive-compulsive disorder ("OCD") traits, social phobia, alcohol dependence, marijuana dependence, nicotine dependence, tic disorder not otherwise specified versus Tourette's Syndrome, marijuana induced psychosis versus Huntington's chorea psychosis versus schizotypal traits noted on axis II, and rule out bipolar disorder type 2. Tr. 278. He assigned a Global Assessment of Functioning ("GAF") score of 50-60. Tr. 279. Later in February, spirometry testing indicated a moderate obstructive lung defect. Tr. 282

In March 2013, Thomas-Brown underwent a consultative physical examination with Dr. Raymond Nolan. Tr. 292-93. She endorsed complaints of arthritis in her hips, knees, and hands, fibromyalgia, CTS, tendinitis in her left elbow, IBS, and prolapsed bowel. Tr. 292. In regards to CTS, Thomas-Brown described numbness in her hands while cooking and upon waking up. *Id.* She reported feeling apprehensive about working with the public due to her IBS, and claimed she has problems with lifting due to rectal leakage. *Id.* She also reported a history of depression and a recent decrease in memory. *Id.* Dr. Nolan noted that Thomas-Brown's mood and affect were appropriate, she was alert and oriented, and she was able to follow commands without difficulty.

*Id.* He also documented that Thomas-Brown remembered him from when he treated her grandmother in the past. *Id.*

On examination, Thomas-Brown was able to go from sitting to standing without difficulty, her gait was normal, she could walk on her toes and heals, and she had a normal Romberg's test and squat rise maneuver. *Id.* Dr. Nolan observed that Thomas-Brown had a positive Tinel's test bilaterally, she was able to make a full fist, there was normal range of motion in her fingers and wrists, no joint deformities, and there was normal sensation involving the distal fingers. Tr. 292-93. She had a positive bilateral straight leg raise test in the supine position, but a negative straight leg test in the seated position. Tr. 293. Thomas-Brown demonstrated normal rotation in her hips and normal deep tendon flexes. *Id.* In regards to fibromyalgia, Dr. Nolan noted only one positive tender point and that "[a]ll other fibromyalgia test sites were negative." *Id.* Dr. Nolan assessed arthritis of the hands, bilateral hip and knee pain, and tennis elbow. *Id.* He further noted that the examination was "compatible with diagnosis of bilateral [CTS]," and was not "specifically supportive of a diagnosis of fibromyalgia." *Id.* Dr. Nolan opined that Thomas-Brown should only occasionally perform repetitive hand and wrist activities, squatting and kneeling, repetitive elbow maneuvers, and pushing and pulling. *Id.* Based on Thomas-Brown's subjective reports of pain, Dr. Nolan opined that she should be limited to standing and walking for two hours in an eight hour day, but she could sit for at least six hours in an eight hour period. *Id.*

In July and August 2014, Thomas-Brown returned to Dr. Carter for treatment. Tr. 301-08. She reported "some weird vibration related to [her] bowel," feeling a lot of pain from her prolapsed bowel, and that she was treating her pain with alcohol and cannabis. Tr. 301. Thomas-Brown described arthritis in her elbows, knees, and hips, with "a lot of pain in the

r[ight] leg, worse with walking and upright, better when in recliner." *Id.* She denied having any breathing problems and reported that she was not taking any medications. *Id.* Dr. Carter referred Thomas-Brown to general surgery for her bowel prolapse and a colonoscopy. *Id.* However, there is no evidence in the record that Thomas-Brown has been seen by a surgeon or underwent a colonoscopy. Dr. Carter also ordered labs and x-rays taken. Tr. 302.

In regards to Thomas-Brown's back pain, the lumbar x-rays revealed "multilevel degenerative changes with satisfactory alignment allowing for mild retrolisthesis of L1 on L2 measuring 3 mm," as well as "no compression deformities [and] no focal soft tissue abnormalities." Tr. 305. Images taken of Thomas-Brown's right hip showed "no acute findings or significant degenerative changes." *Id.* Dr. Carter noted that lab results "showed no evidence of effects of alcohol on her liver." Tr. 311. Dr. Carter instructed Thomas-Brown to try Lyrica twice a day and return in a month. Tr. 308. At the hearing, Thomas-Brown reported that after taking one dose her "heart almost gave out" and Dr. Carter informed her to stop taking the medication. Tr. 51-52.

On August 12, 2014, a hearing was conducted before ALJ Robert Spaulding in connection with Thomas-Brown's DIB application. Tr. 44-80. Thomas-Brown, her counsel, and Francene Geers, a Vocational Expert ("VE"), were present. *Id.* At the hearing, Thomas-Brown testified in relevant part that she was using cannabis and drinking four 12-ounce beers a day to treat her pain, although she did not have a license or doctor's recommendation for use of medicinal cannabis at that point. Tr. 50-54. She stated that she was not currently taking any medications, but had been working with Dr. Carter for years, unsuccessfully, to find a medication that worked. Tr. 51. She alleged that Dr. Carter approved of her daily alcohol consumption for treating pain. Tr. 55. Thomas-Brown then described the duties of her past

work as a waitress, busser, bartender, and cook; including prepping meals, washing dishes, constantly being on her feet, and lifting 156 pound kegs of beer onto a pallet. Tr. 56-60.

Thomas-Brown testified that she lives in a motor-home situated on a fisherman's property where she watches over his equipment in exchange for keeping her trailer there. Tr. 61. She also detailed that she borrows only enough electricity from her neighbor to power a refrigerator, relying on propane for heating and cooking; and she frequently visits with friends that live on and off the property. Tr. 60, 62-63, 65. Thomas-Brown stated that she used to enjoy going to local venues to dance and watch her friends' band perform, but that she does not go anymore because she can no longer dance and even nodding her head to the rhythm of the music causes pain. Tr. 64-65. Thomas-Brown further testified that she does not cook often due to a lack of appetite and because standing for more than 20 minutes is too painful. Tr. 66. After stating that her "fibromyalgia works in weird ways," the ALJ stopped Thomas-Brown from testifying further on the subject, because Dr. Nolan's tests were negative for fibromyalgia and there was no objective medical evidence of fibromyalgia in the record. Tr. 68. Thomas-Brown then testified that once or twice a week she is capable of doing her dishes, making her bed, and sweeping the floor of her home. Tr. 68-69. She alleged suffering lower back pain for the last seven or eight years. Tr. 69.

Upon examination by her attorney, Thomas-Brown stated that she could not work eight hours a day because she could not be on her feet that long, and could not commit to working five days a week because she is "down" for two days after doing only an hour and a half of chores. Tr. 71. She further testified that her hands "lock up" on her, causing her to drop things. *Id.* Thomas-Brown then explained that the near three-year gap between her appointments with Dr. Carter was due to her not having insurance, but she was able to see the doctor again after being

placed on the Oregon Health Plan in January 2014. Tr. 72. She further explained that although she did not have health insurance when she saw Dr. Carter in October 2011, she was able to pay a reduced price while on unemployment. *Id.* Finally, Thomas-Brown testified that the last time she received any mental health treatment was in the early 1990's. *Id.*

After the hearing, in September 2014, Dr. Carter recommended the use of medicinal cannabis for Thomas-Brown's "severe pain." Tr. 310.

On December 8, 2014, in a written decision the ALJ denied Thomas-Brown's application for DIB. Tr. 17. Thomas-Brown timely requested review of the ALJ's decision, Tr. 12, and the Appeals Council denied her request for review on May 6, 2016. Tr. 1-3. In consequence, the ALJ's decision of December 8, 2014, became the Administration's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF THE ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the ALJ found Thomas-Brown did not engage in substantial gainful activity at any time during the period from the alleged onset date of April 8, 2012, through the date of the hearing. Tr. 19.

At the second step, the ALJ found Thomas-Brown had the following severe impairments: osteoarthritis (right hip); degenerative disc disease of lumbar spine; moderate obstructive lung defect; PTSD; ADHD; OCD; polysubstance dependence; and obesity. *Id.*

At the third step, the ALJ found that none of Thomas-Brown's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, Subpt P, App. 1. Tr. 21. The ALJ therefore properly conducted an assessment of Thomas-Brown's residual functional

capacity ("RFC"). Specifically, the ALJ found that Thomas-Brown had the RFC to perform light work,[3] with the following additional limitations:

> The claimant is limited to occasional climbing of ladders, ropes, scaffolds, and stairs/ramps. She is limited to occasional crawling. She is limited to no exposure to occupational irritants such as fumes, odors, dusts, gases and poorly ventilated areas. She is limited to simple and routine tasks consistent with unskilled work as defined by the Dictionary of Occupational Titles (DOT).

Tr. 23. In reaching this finding, the ALJ considered all symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. *Id.* The ALJ also considered opinion evidence. Tr. 27.

At the fourth step, the ALJ found that Thomas-Brown was unable to perform her past relevant work. Tr. 29.

At the fifth step, the ALJ found in light of Thomas-Brown's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that she could perform. *Id.* Specifically, the ALJ found that Thomas-Brown could perform the occupations of marker, sorter, and office helper. Tr. 30.

## ANALYSIS

Thomas-Brown argues the ALJ: (1) failed to find CTS and rectal prolapse "severe" impairments at step two; (2) failed to give clear and convincing reasons for rejecting her symptom testimony; (3) failed to credit the opinion of examining physician Dr. Raymond Nolan; and (4) erred in assessing Thomas-Brown's residual functional capacity, which prejudiced the ALJ's step five determination that Thomas-Brown retains the ability to perform other work in the national economy. Each argument is addressed in turn.

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

## I. Step Two

At step two, the ALJ must consider the medical severity of plaintiff's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 416.920(a). An impairment is "severe" if it significantly limits the plaintiff's ability to perform basic work activities and is expected to continue for a period of twelve months or longer. *Bowen*, 482 U.S. at 141. A person who is able to perform basic work activity possesses the "abilities and aptitudes necessary to do most jobs." *Id.* If the ALJ finds that the plaintiff's impairments are not severe or do not meet the duration requirement, the plaintiff will be found not disabled under the meaning of the Act. *Id.* However, if the ALJ determines that the plaintiff does indeed suffer from a severe impairment, the ALJ will proceed with the next steps of the evaluation. 20 C.F.R. § 416.920(a)(4)(ii–iii); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). At step two, a claim will be rejected only if the evidence establishes that the plaintiff's impairments present only a slight abnormality that has no more than a minimal effect on an individual's ability to work. *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005); SSR 96-3p, 1996 WL 374181 (July 2, 1996). Accordingly, the step-two inquiry is merely a *de minimus* screening device to dispose of groundless claims. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen*, 482 U.S. at 137, 153-54).

Thomas-Brown first argues that the ALJ should have considered CTS a severe impairment at step two. The ALJ provided two valid reasons for why he did not find CTS a severe impairment. First, the ALJ noted that the objective medical evidence did not support finding more than mild wrist and hand limitations. Tr. 20. Dr. Nolan opined that Thomas-Brown's positive Tinel's test was "compatible with" CTS and she should be limited to occasional hand and wrist activities. Tr. 293. The ALJ, however, found that Dr. Nolan's assessment was inconsistent with his examination results showing that Thomas-Brown had no joint deformities or tenderness, normal range of motion in her fingers and wrists, normal strength in her upper

PAGE 15 – OPINION AND ORDER

extremities, and her ability to make a full fist. Tr. 20, 293. An ALJ may properly discount a physician's findings when there is conflict between the physician's opinion and his treatment notes. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

Second, the ALJ noted that Dr. Nolan's assessment of CTS conflicted with Thomas-Brown's reported activities of daily living ("ADLs"), and relied heavily on her less-than-credible self-reports. Tr. 20. For example, on examination, Thomas-Brown reported decreased sensation in her fingertips; however, Dr. Nolan noted normal sensation in his report. Tr. 20, 293. Furthermore, despite Thomas-Brown's allegations of debilitating pain, numbness, and cramping in her hands, her activities of daily living, including a wide-range of household chores, yardwork, shopping, and computer use, indicated only mild limitations stemming from CTS-like symptoms. Tr. 20, 219-20, 226; *see also Webb*, 433 F.3d at 686 ("An impairment is not severe if it is merely a 'slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'") (citation omitted). Moreover, the ALJ accounted for Thomas-Brown's non-severe symptoms relating to her hands by limiting her to light level lifting and carrying in the RFC. Tr. 20. Accordingly, the ALJ did not err in finding Thomas-Brown's CTS non-severe at step two.

Thomas-Brown next argues the ALJ erred by finding rectal prolapse not severe. At step two of the sequential analysis, "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source," and an ALJ "will not use [a claimant's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)." 20 C.F.R. § 404.1521. Here, the ALJ found there was no "objective medical evidence" showing Thomas-Brown's rectal prolapse was "more than intermittent or cause[d] severe functional limitations of vocational relevance." Tr. 21. As the ALJ correctly noted, a

review of the brief medical record indicates that any notation of rectal prolapse or IBS is based solely on Thomas-Brown's self-reports and these conditions were never actually diagnosed nor treated by a medical source. Tr. 273, 292, 302.

Moreover, the ALJ noted that after Thomas-Brown informed Dr. Carter of her alleged issues with rectal prolapse and the doctor referred her to a surgeon for further treatment, she failed to seek any additional treatment, and never followed up with Dr. Carter. Tr. 21, 273. Given that an ALJ may properly discredit a claimant's allegations concerning the severity of a *validly diagnosed* impairment when there is an "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment," the Court finds that this rationale applies with equal force to the ALJ finding Thomas-Brown's *mere allegations* of rectal prolapse not severe at step two. *See Tommasetti*, 533 F.3d at 1039; *infra*. Accordingly, the ALJ's step two findings were based on substantial evidence and he did not err in making his determination.

## II.     Thomas-Brown's Subjective Symptom Testimony

Thomas-Brown argues the ALJ erred in rejecting her subjective symptom testimony. The Ninth Circuit established two requirements for a claimant to present credible symptom testimony: the claimant must produce objective medical evidence of an impairment or impairments; and must show the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986). The claimant, however, need not produce objective medical evidence of the actual symptoms or their severity. *Smolen*, 80 F.3d at 1284.

If the claimant satisfies the above test and there is not any affirmative evidence of malingering, the ALJ can reject the claimant's testimony only if the ALJ provides clear and convincing reasons for doing so. *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007). General

assertions that the claimant's testimony is not credible are insufficient. *Id.* The ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints." *Id.* (citing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir, 1995) (internal citation omitted). However, even if not all of the ALJ's findings for discrediting symptom allegations are upheld, the overall decision may still be upheld, assuming the ALJ provided other valid rationales. *Batson*, 359 F.3d at 1197.

Thomas-Brown contends that the ALJ erred in finding her symptom testimony not fully credible because the alleged severity of her symptoms was unsupported by the medical evidence. In support, Thomas-Brown notes that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." Pl.'s Br. at 11 (citing SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ, however, did not discount the severity of Thomas-Brown's symptoms solely because her symptoms were unsupported by her largely unremarkable imaging studies and examination results; rather, the ALJ provided additional clear and convincing reasons for discrediting her testimony.

First, the ALJ noted that despite Dr. Carter assessing Thomas-Brown as having hip arthritis and lumbar spondylitis, he "did not assess any related limitations or indicate required treatment except to prescribe medication (Lyrica) and recommend claimant 'return in a month.'" Tr. 25 (citing Tr. 308). "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra*, 481 F.3d at 751 (citing *Johnson v. Shalala*, 60 F.3d

1428, 1434 (9th Cir. 1995)); *see also Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999); *Tommasetti*, 533 F.3d at 1039.

Second, the ALJ found that Thomas-Brown's reports to Dr. Reagan concerning her ability to remember events from when she was only one year old raised a credibility concern. Tr. 26. Dr. Reagan noted that there was a "possible reliability issue," because "people do not have formed memories from this age." Tr. 277. Thomas-Brown argues that although her professed memories are inconsistent with child development, they are a product of her mental illness and are explained by Dr. Reagan's finding of schizotypal traits. Tr. 278. This argument merely offers Thomas-Brown's preferred interpretation of the evidence; however, variable interpretations of the evidence are insignificant if the ALJ's interpretation is a rational reading of the record. *See Batson*, 359 F.3d at 1193. Here, the ALJ reasonably inferred that Thomas-Brown's fabrication of memories called into question the veracity of her other symptom allegations.

Moreover, Dr. Reagan did not attribute Thomas-Brown's implausible memories to mental health issues; rather, he opined that Thomas-Brown's reports of hearing angels talk to her suggested "schizotypal traits, marijuana induced psychosis or psychosis from [possible] Huntington's chorea." Tr. 278. In any event, whether Dr. Reagan also believed that Thomas-Brown's fabricated memories were a result of possible mental health conditions—or other causes—is ambiguous at best, and "the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti*, 533 F.3d at 1041-42 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995)).

Third, the ALJ found that despite Thomas-Brown's allegations of disabling mental health impairments, she "does not have a history of psychiatric hospitalizations, nor is she currently in any mental health treatment for her reported symptoms." Tr. 27, 72-73, 274-79. Thomas-Brown asserts

that the reason she did not receive mental health treatment was because she could not afford treatment until she was placed on the Oregon Health Plan ("OHP"). Ninth Circuit precedent holds that "'unexplained, or inadequately explained, failure to seek treatment' may be the basis for an adverse credibility finding unless one of a 'number of good reasons for not doing so' applies." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). One of those good reasons is a "claimant's failure to obtain treatment [s]he cannot obtain for lack of funds." *Id.* (citation omitted).

Thomas-Brown's stated inability to afford treatment is unpersuasive. At the time of the hearing, Thomas-Brown had been on the OHP for approximately eight months. Tr. 72. During that time she was able to schedule several appointments with Dr. Carter, during which she complained solely about physical health issues, *e.g.*, back and hip pain, prolapsed bowel, and tennis elbow. Tr. 301-02, 308, 312. Less than a month after the hearing, Thomas-Brown returned to Dr. Carter for the singular purpose of obtaining a medical cannabis recommendation for treatment of her "severe pain." Tr. 310. Because a person's typical reaction is to seek medical relief from their debilitating symptoms, the ALJ was justified in finding that Thomas-Brown's failure to seek out mental health treatment—particularly after any financial barrier was removed—reflected negatively on her credibility regarding her mental health allegations. *See Orn*, 495 F.3d at 638. Moreover, despite Thomas-Brown's testimony that Dr. Carter prescribed Lyrica, in part, to treat her depression, the doctor's treatment notes indicate that it was prescribed for hip and back pain, and there is no mention of depression made in the note. Tr. 308, 315.

Finally, the ALJ found Thomas-Brown's symptom testimony undermined by the reason she stopped working her last job, her collection of unemployment benefits, and the timing of her alleged disability onset date in relation to the expiration of her unemployment benefits. Tr. 27. In making

this determination, the ALJ first noted that Thomas-Brown left her last job in February 2010 due to a lay-off, and not because of her impairments. Tr. 27, 196. She then received unemployment compensation, "during which time she would have certified that she was able and available to work, and was actively seek[ing] work." Tr. 27, *see also* Tr. 196. After exhausting her unemployment benefits, Thomas-Brown applied for DIB, alleging her disability onset in April 2012—the same month her unemployment expired. *Id.* The ALJ also noted that based on the medical record and Thomas-Brown's function reports, "there has been no significant change in her conditions/impairments since April 2012 when her unemployment benefits expired and she allegedly became disabled from working." Tr. 27.

Thomas-Brown notes that receipt of unemployment benefits can be used by an ALJ to undermine a claimant's allegations of disability only when the recipient held herself out as being available for full-time work. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161-62 (9th Cir. 2008). As such, Thomas-Brown argues that the ALJ's finding was not based on substantial evidence because in Oregon, "a person with a disability may apply for unemployment benefits as long as he or she is able to perform 'some work.'" Pl.'s Br. at 13 (citing OR. ADMIN. R. 471-030-0036(3)(e)). Here, the record does not establish whether Thomas-Brown held herself out as available for full-time or part-time work. As such, the ALJ erred in finding that Thomas-Brown's receipt of unemployment compensation indicated she was able and willing to accept full-time work.

Thomas-Brown further argues that the reason she exited the workforce and her collection of unemployment benefits are irrelevant because they occurred prior to her disability onset date. As a preliminary matter, an ALJ may take into account the reasons a claimant exited the workforce when evaluating symptom testimony. *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir.

2001). Moreover, material issues relevant to a disability claim do not exist in a temporal silo that is automatically fixed by the disability onset date a claimant happens to allege. Indeed, facts do matter, and an ALJ need not turn a blind eye to context. As the ALJ pointed out, the absence of any evidence indicating that Thomas-Brown's impairments worsened during the time between when she was laid-off from her job and her alleged disability onset, coupled with Thomas-Brown's assertion that her disability began as soon as her unemployment benefits terminated, calls into question whether her alleged inability to work is actually due to reasons unrelated to disability. Tr. 27. The ALJ's finding in this regard was based on a rational interpretation of substantial evidence found in record.

In sum, with the exception of one harmless error, the ALJ provided several valid reasons supported by substantial evidence for finding Thomas-Brown's symptom testimony less than fully credible. Accordingly, the ALJ's credibility determination is upheld. *Batson*, 359 F.3d at 1196-97.

## III.   Dr. Nolan's Opinion

Thomas-Brown argues the ALJ erred in giving little weight to the opinion of Dr. Nolan. Specifically, Thomas-Brown contends that the ALJ failed to provide sufficient reasons for discrediting Dr. Nolan's finding that she should be limited to a maximum of two hours of standing or walking in an eight-hour period and should perform repetitive hand and wrist activities on an occasional basis only. To reject the uncontroverted opinion of a treating or examining physician, an ALJ must articulate "clear and convincing" reasons for so doing. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester*, 81 F.3d at 830-831). If a treating or examining physician's opinion is in conflict with substantial medical evidence or with another physician's opinion, however, it may be rejected for merely "specific and legitimate reasons." *Id*

Dr. Nolan's standing and upper extremity limitations were contradicted by the findings of reviewing consultants, Dr. Richard Alley and Dr. Martin Kehrli. *Compare* Tr. 293, *with* Tr. 89-90, 106-07. Drs. Alley and Kehrli found Thomas-Brown could stand for six hours in an eight-hour period, and that any issues with her hands or wrists would be accounted for by a reduced lifting limitation. Tr. 89, 106-07. Thus, the ALJ needed to provide only specific and legitimate reasons for rejecting Dr. Nolan's opined limitations. *Bayliss,* 427 F.3d at 1216. Here, the ALJ did just that.

First, the ALJ discounted Dr. Nolan's opinion because, as Dr. Nolan noted himself, it was "based on [Thomas-Brown's] subjective complaints." Tr. 27, 293. "An ALJ may reject a treating physician's opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti*, 533 F.3d at 1041 (citing *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999)); *see also Fair*, 885 F.2d at 605; *Batson*, 359 F.3d at 1195. As discussed, the ALJ gave sufficiently clear and convincing reasons for discrediting Thomas-Brown's symptom testimony. Accordingly, the ALJ permissibly disregarded Dr. Nolan's opinions that were premised on those subjective complaints.

Thomas-Brown argues that "[b]asing a medical opinion, at least in part, upon a patient's reported symptoms does not detract from the assessment, since reliance on reported symptoms 'hardly undermines [an] opinion as to . . . functional limitations, as [a] patient's report of complaints, or history, is an essential diagnostic tool.'" Pl.'s Br. at 8 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003)) (alterations in original). Besides not having any binding authority over this Court, Thomas-Brown's reliance on *Green-Younger* for even its persuasive value is misplaced. In that case, the ALJ dismissed the opinion of a physician—who had a three year treating history with the claimant—regarding the claimant's fibromyalgia limitations. *Green-Younger*, 335 F.3d at 106-07. The Second Circuit found the ALJ erred by

failing to give controlling weight to the treating physician, because the ALJ "effectively require[ed] objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia . . . . a disease that eludes such measurement." *Id.* at 106, 108. The lengthy treatment history between the claimant and physician, and the impairment at issue, fibromyalgia, make *Green-Younger* inapplicable to the current discussion. However, what makes *Green-Younger* most immaterial to the case at bar, is the fact that the Second Circuit also determined that the ALJ's reasons for finding the claimant not credible were unsupported. *Id.* at 108-09. Accordingly, *Green-Younger* is inapposite.

Second, the ALJ found Dr. Nolan's opinion was contrary to the objective examination findings and imaging studies in the record. Tr. 27. When evaluating conflicting opinions, an ALJ is not required to accept an opinion that is unsupported by clinical findings, or is brief or conclusory. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). In regards to Thomas-Brown's upper extremity limitations, the ALJ noted that although Dr. Nolan observed a positive Tinel's sign bilaterally, she had a normal range of motion in her wrists and fingers, no hand or finger joint deformities or tenderness, normal strength, normal sensory examination, and only a subjective report of decreased sensation in the fingers. Tr. 27, 292-93. Furthermore, the ALJ adequately accounted for any noted limitations in Thomas-Brown's upper extremities by limiting her to the light exertional level. Tr. 27.

In regards to Thomas-Brown's hip and lumbar impairments, the ALJ found Dr. Nolan's standing limitation contradicted by the largely unremarkable objective medical evidence. Tr. 27. For example, images taken of Thomas-Brown's lumbar region in connection with her treatment by Dr. Carter showed degenerative changes without any acute findings: "satisfactory alignment," "mild retrolisthesis of L1 on L2 measuring 3 mm," and "no compression deformities [or] soft

tissue abnormalities." Tr. 27, 305-06. Images taken of Thomas-Brown's pelvis showed "no acute findings or significant degenerative changes." Tr. 306. On examination with Dr. Nolan, although she had a positive straight leg test bilaterally at 80 degrees, Thomas-Brown demonstrated no neurological, motor, or sensory deficits; she could walk on her heels and toes without issue; and had normal reflexes, gait, tandem walk, and squat maneuver. Tr. 27, 292-93. As the ALJ correctly noted, these mostly normal results indicate that Dr. Nolan's assessed limitations were largely based on Thomas-Brown's subjective complaints. Tr. 27. The ALJ did not err in finding Dr. Nolan's brief and conclusory opinion was not supported by clinical findings, including the results from the examination he administered. *See Thomas*, 278 F.3d at 957.

Last, the ALJ found Dr. Nolan's opinion was inconsistent with Thomas-Brown's reported ADLs. A discrepancy between a physician's opinion and a claimant's daily activities can provide a specific and legitimate reason to reject that opinion. *See Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014); *Morgan*, 169 F.3d at 600-02 (finding an inconsistency between a treating physician's opinion and a claimant's daily activities a specific and legitimate reason to discount the treating physician's opinion). Here, the ALJ noted Thomas-Brown's ability to perform a wide range of activities, *e.g.*, vacuuming, dishes, laundry, taking out the garbage, cooking, grocery shopping, reading, computer usage, dog-sitting, visiting with friends, and yardwork. Tr. 27, 217, 219-20, 225. While a claimant "need not be completely incapacitated" in order to support a finding of disability, the ALJ finding Thomas-Brown's ADLs indicated that she was not as limited as Dr. Nolan opined was a specific and legitimate reason based on substantial evidence found in the record. *Ghanim*, 763 F.3d at 1162; *see also* Tr. 27. Thus, the

ALJ did not err and his treatment of Dr. Nolan's opinion was in accordance with the proper legal standards.

## IV.    RFC and Step Five

Thomas-Brown contends the Commissioner failed to incorporate all of her limitations into the RFC; thus, failing to meet her burden of proving that Thomas-Brown retains the ability to perform other work that exists in the national economy. The ALJ has the responsibility of determining the claimant's RFC. 20 C.F.R. § 404.1546(c). The RFC is the "most [a claimant] can still do despite [the claimant's] limitations," and is "based on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1). The RFC is used at step four of the sequential analysis to determine if the claimant is able to perform past relevant work, and at step five to determine if the claimant can adjust to other work that exists in significant numbers in the national economy. 20 C.F.R. § 416.920(a). Only limitations supported by substantial evidence must be incorporated into the RFC and, by extension, the dispositive hypothetical question posed to the VE. *Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001). The Court must uphold the step five determination "if the ALJ applied the proper legal standard and his decision is supported by substantial evidence." *Bayliss*, 427 F.3d at 1217.

Thomas-Brown argues the ALJ should have found her disabled at step five because "Dr. Reagan opined that [she] has at least moderate limitations with instructions," and the VE testified that the hypothetical individual being "off task 20% of an eight-hour day . . . would preclude all work." Pl.'s Br. at 17; *see also* Tr. 78. However, as the Commissioner correctly notes, Dr. Reagan actually stated that Thomas Brown "would have a 'modest difficulty with instructions;' *modest* generally implying minimal or small, versus *moderate* having specialized meaning with[in] Social Security law." Def.'s Br. at 13 (citing Tr. 278) (emphasis in original). Moreover,

Thomas-Brown fails to articulate how a modest difficulty with instructions translates to being off task for 20% of a workday.

As to the remainder of Thomas-Brown's arguments, the Court finds they are simply a rehashing of arguments already made. Thomas-Brown argues that had the ALJ accepted Dr. Nolan's standing limitation, use of the Medical-Vocational Guidelines would have directed a finding of disability; and as a result of the ALJ's failure to include the standing limitation in the hypothetical to the VE, her testimony has no evidentiary value. In the same vein, Thomas-Brown argues that had the ALJ included Dr. Nolan's opined upper extremity limitations into the RFC and hypothetical, alongside the aforesaid standing limitation, there would be no remaining jobs identified by the VE that she is capable of performing. In forming the RFC, "the ALJ must only include those limitations supported by substantial evidence." *Robbins*, 466 F.3d at 886. Here, the ALJ included all limitations he found credible and supported by substantial evidence in the hypothetical presented to the VE. Tr. 74-79. In response, the VE testified there were several jobs existing in the national economy that the hypothetical individual could perform. *Id.* The additional limitations that Thomas-Brown argues were missing from the hypothetical and RFC were, as discussed, properly discounted by the ALJ, and her argument fails. Accordingly, the ALJ did not err at step five.

//

//

//

//

//

//

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision denying Thomas-Brown's application for disability insurance benefits is AFFIRMED.

**IT IS SO ORDERED**.

DATED this 26th day of October, 2017.

Honorable Paul Papak
United States Magistrate Judge